James E. Cecchi
Jason H. Alperstein
**CARELLA BYRNE CECCHI**
**BRODY & AGNELLO, P.C.**
5 Becker Farm Road
Roseland, NJ 07068
Telephone: (973) 994-1700
Fax: (973) 994-1744
jcecchi@carellabyrne.com
jalperstein@carellabyrne.com

*Attorneys for Plaintiff and the proposed Class*

[Additional Attorneys on Signature Page]

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| THEREASA ILENE HARRIS VAUGHN, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>COGNIZANT TECHNOLOGY SOLUTIONS CORPORATION, and TRIZETTO PROVIDER SOLUTIONS, LLC,<br><br>Defendants. | Case No.:<br><br>**COMPLAINT – CLASS ACTION**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Thereasa Ilene Harris Vaughn ("Plaintiff"), individually, and on behalf of all others similarly situated ("Class Members"), by and through undersigned counsel, brings this Class Action Complaint against Cognizant

Technology Solutions Corporation ("Cognizant") and TriZetto Provider Solutions, LLC ("TriZetto") (collectively, "Defendants"). Plaintiff alleges the following upon information and belief based on the investigation of counsel, except as to those allegations that specifically pertain to Plaintiff, which are alleged upon personal knowledge.

## INTRODUCTION

1. This "hub-and-spoke" class action arises out of a data breach in which unauthorized third parties extracted and copied the sensitive Personally Identifiable Information ("PII")[1] and Protected Health Information ("PHI") (collectively, "Private Information") of Plaintiff and Class Members from the computer systems of Defendants (the "Data Breach" or the "Breach").

2. The hub in this case is TriZetto, which provides a variety of software solutions to healthcare providers, including revenue cycle management programs. Thus, part of TriZetto's regular business activities involve collecting, maintaining, and storing vast quantities of highly sensitive Private Information from its Clients' patients and policyholders, including Plaintiff and Class Members.

[1] "Personally identifiable information" generally means information that can be used to distinguish or trace an individual's identity, either alone or when combined with other personal or identifying information. 2 C.F.R. § 200.79. At a minimum, it includes all information that on its face expressly identifies an individual. *Id.*

3. TriZetto provides various back-office services for its Clients, including claims administration, payment processing, and data management. For TriZetto to provide these services to its Clients, they must grant TriZetto access to their customers' Private Information.

4. Plaintiff's claims arise from Defendants' failure to properly secure and safeguard Private Information entrusted to them by Defendants' Clients, spoke healthcare providers and insurers, and Defendants' accompanying responsibility to store and transfer that information.

5. Without receiving this information from its Clients, Plaintiff's and Class Members' healthcare providers and insurers, Defendants could not perform their regular business activities. By obtaining, collecting, using, and deriving a benefit from the Private Information of Plaintiff and Class Members, Defendants assumed legal and equitable duties to those individuals to protect and safeguard that information from unauthorized access and intrusion.

6. Defendants had numerous statutory, regulatory, contractual, and common law duties and obligations, including those based on affirmative representations to their Clients, Plaintiff, and Class Members, to keep their Private Information confidential, safe, secure, and protected from unauthorized disclosure or access.

7. On October 2, 2025, TriZetto discovered the occurrence of a cyber incident involving Plaintiff's and Class Members' PII and PHI,[2] which TriZetto investigated to determine the nature and scope of the Data Breach.[3]

8. TriZetto's investigation apparently determined that an unauthorized third-party accessed its IT Network beginning around November 2024 and accessed records containing Private Information of individuals obtained by TriZetto's Clients.[4] Thus, it took Trizetto nearly a year to discover their systems and networks had been breached by cybercriminals, which speaks to the deficient cybersecurity measures Trizetto had in place at the time of the Data Breach.

9. Upon information and belief, the following types of Private Information were compromised in the Data Breach: name, address, Social Security number ("SSN"), date of birth, and demographic, medical, and health insurance information.

10. On or around December 9, 2025—***more than two months*** after discovering the Data Breach and ***more than thirteen months*** after the initial

---

[2] *Letter to OCHIN*, TriZetto Provider Solutions (Dec. 17, 2025) https://oag.ca.gov/system/files/TPS%20Letter%20to%20Affected%20Business%20Partners.pdf.
[3] *Id.*
[4] *Notice of Data Breach*, Gardner Health Services (Dec. 22, 2025) https://oag.ca.gov/system/files/TriZetto%20Data%20Breach%20Notification%20Letter%2012.22.2025%20-%20scanned.pdf.

unauthorized access—TriZetto began notifying its Clients and some Class Members about the Data Breach.[5]

11. Defendants owed Plaintiff and Class Members a duty to take all reasonable and necessary measures to keep the Private Information they maintained safe and secure from unauthorized access. Defendants solicited and obtained the Private Information from their Clients and used and derived a benefit from the Private Information, yet Defendants breached their duty by failing to implement or maintain adequate security practices.

12. The Private Information compromised in the Data Breach contained highly sensitive patient data, representing a gold mine for data thieves.

13. Because the potential for improper disclosure and theft of Plaintiff's and Class Members' Private Information was a known risk to Defendants, they were on notice that failing to take necessary steps to secure the Private Information left them vulnerable to a data breach.

14. In possession of the Private Information accessed in the Data Breach (and a thirteen-month head start), data thieves can commit crimes including, *e.g.*, opening new financial accounts in Class Members' names, taking out loans in Class Members' names, using Class Members' information to obtain medical services,

[5] *Notice of Data Breach*, *supra* n. 4.

using Class Members' information to obtain government benefits, filing fraudulent tax returns using Class Members' information, and giving false information to police during an arrest.

15. Therefore, Plaintiff and Class Members have suffered and are at an imminent, immediate, and continuing increased risk of suffering, ascertainable losses including identity theft and other fraudulent misuse of their Private Information, loss of the benefit of their bargain, out-of-pocket expenses incurred to remedy or mitigate the effects of the Data Breach, and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach.

16. In breaching their duties to properly safeguard Plaintiff's and Class Members' Private Information and to give them timely, adequate notice of the Data Breach's occurrence, Defendants' conduct amounts to negligence and recklessness and violates federal and state laws.

17. Upon information and belief, TriZetto failed to properly secure Plaintiff's and Class Members' data and failed to monitor and implement security practices for the computer network and systems that housed the Private Information. Had TriZetto properly monitored its IT network, it would not have taken TriZetto nearly a year to discover the Data Breach.

18. As TriZetto's parent company, Cognizant failed to adequately supervise TriZetto's cybersecurity practices to ensure they were sufficient to protect

Plaintiff's and Class Members' Private Information against unauthorized disclosure.

19. Because the Private Information Defendants maintained for their Clients is now in the hands of data thieves and other unauthorized third parties, Defendants' negligent conduct has left Plaintiff's and Class Members' identities and assets at risk.

20. Plaintiff seeks to remedy these harms on behalf of herself and all similarly situated individuals whose Private Information was accessed and/or compromised during the Data Breach.

21. Accordingly, Plaintiff, on behalf of herself and the Class, asserts claims for negligence, negligence *per se*, unjust enrichment, breach of implied contract, and statutory claims under Mississippi state law.

## PARTIES

***Plaintiff***

22. Plaintiff Thereasa Ilene Harris Vaughn is a citizen and resident of Jackson, Madison County, Mississippi.

***Defendants***

23. Defendant Cognizant is a Delaware corporation with its principal place of business located at 300 Frank W Burr Blvd, Suite 600, Teaneck, Bergen County, New Jersey.

24. Defendant TriZetto, a wholly owned subsidiary of Cognizant, is a Delaware corporation with its principal place of business located at 221 Bolivar St., Jefferson City, Coley County, Missouri.

## JURISDICTION AND VENUE

25. This Court has jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. The number of Class Members is more than 100, and at least one member of the Class defined below is a citizen of a different state that is diverse from Defendants' citizenship. Thus, minimal diversity exists under 28 U.S.C. § 1332 (d) (2) (A).

26. This Court has personal jurisdiction over Defendant Cognizant because Cognizant maintains its principal place of business in this District.

27. This Court also has personal jurisdiction over Defendant TriZetto because TriZetto, a wholly owned subsidiary of Cognizant, conducts substantial business in this District, engages in the conduct at issue in this District, and/or otherwise has substantial contacts with this District and purposely avails itself of the Courts in this District, and a substantial part of the acts and omissions giving rise to this action occurred within this District.

28. Venue is proper in this district because Defendant Cognizant's principal place of business is located in this District, and because a substantial part

of the events, acts, and omissions giving rise to Plaintiff's claims occurred in this District.

## FACTUAL ALLEGATIONS

### A. Background on Defendants

29. Cognizant is an information technology company that acquired TriZetto in 2014. Through TriZetto's products and services, Cognizant asserts it serves over 200 million healthcare members and over 200 health plans, and processes 4.4 billion transactions a year.[6]

30. TriZetto is a for-profit healthcare technology company. As a subsidiary of Cognizant Technology Solutions, TriZetto operates as a major provider of revenue cycle management ("RCM") software and services, acting as a clearinghouse and financial intermediary for healthcare providers, hospitals, and health systems across the United States. TriZetto's business model relies on the collection, processing, and storage of massive volumes of sensitive patient data—including claims, billing records, and eligibility transaction reports—to facilitate payments between healthcare providers and insurance payers.[7]

---

[6] *Trizetto Healthcare Administration Solutions*, Cognizant, https://www.cognizant.com/us/en/industries/healthcare-technology-solutions/trizetto (accessed Jan. 12, 2026).

[7] TriZetto Provider Solutions, https://www.trizettoprovider.com/ (accessed Jan. 12. 2026).

31. As a condition of doing business, TriZetto requires that its Clients entrust it with highly sensitive personal information belonging to their customers, including Plaintiff and Class Members. In the ordinary course of receiving services from Trizetto's Clients, Plaintiff and Class Members were required to provide their Private Information to Defendants' Clients, who, in turn, entrusted it to Defendants.

32. Each of Defendants' Clients stores the Private Information of their customers on TriZetto's platform through the use of Defendants' offered services and software.

33. Defendants' marketing demonstrates they are well aware that data security is a key component of the services they provide to their Clients. For example, in a cross-branded white paper about TriZetto's Anesthesia Billing Software Services, Defendants describe their "customer data protection methodology" as SOC2 compliant, claim they encrypt Clients' data in transit and at rest, and purport to employ a "comprehensive security strategy."[8] Similarly, TriZetto describes its credentialing services as HIPAA-compliant and "ahead of the curve" in employing "security best practices."[9]

---

[8] *Anesthesia Billing Software Solutions*, TriZetto, https://www.trizettoprovider.com/wp-content/uploads/Anesthesia-Data-Security_WhitePaper.pdf (accessed Mar. 12, 2026).

[9] *Safety First: Managing Enrollments Properly through PECOS*, TriZetto (Apr. 25, 2023) https://www.trizettoprovider.com/safety-first-managing-enrollments-properly-through-pecos.

34. Upon information and belief, Defendants made promises and representations to their Clients and the public, including Plaintiff and Class Members, that they would keep the Private Information they obtain about individuals from their Clients safe, confidential, and private.

35. During the ordinary course of their business, Defendants receive the Private Information of individuals, such as Plaintiff and Class Members, from Defendants' Clients. Plaintiff and Class Members have no say in what is provided to Defendants and how that access occurs.

36. Defendants' Clients used Defendants' services and software, and in doing so entrusted Defendants with the most sensitive Private Information of their customers, like Plaintiff and Class Members.

37. Because cloud-based databases and software applications, like Defendants' products, are prime targets for cybercriminals due to the sheer volume of sensitive data they house and transfer, Defendants knew the risks of a potential data breach. One recent report has highlighted the risks presented specifically by cloud storage as follows:[10]

> It is estimated that more than 60% of the world's corporate data is stored in the cloud. ***That makes the cloud a very attractive target for hackers. In 2023, over 80% of data breaches involved data stored in the cloud***. That is not just because the cloud is an attractive target. In

[10] Stuart Madnick, *Why Data Breaches Spiked in 2023*, HARVARD BUS. REV. (FEB. 19, 2024), https://hbr.org/2024/02/why-data-breaches-spiked-in-2023 (Last visited Jan. 6, 2026).

> many cases, ***it is also an easy target due to cloud misconfiguration*** – that is, companies unintentionally misuse the cloud, such as allowing excessively permissive cloud access, having unrestricted ports, and use unsecured backups.

38. By receiving and storing the Private Information of Plaintiff and Class Members for their own financial benefit, Defendants had a continuous duty to adopt and employ reasonable measures to protect Plaintiff's and the Class Members' Private Information from disclosure to unauthorized third parties.

**B. The Data Breach**

39. On October 2, 2025, TriZetto discovered a cyber incident involving its systems and networks. TriZetto then launched an investigation to determine the nature and scope of the Data Breach.

40. TriZetto's investigation determined that an unauthorized third-party accessed its IT Network beginning around November 2024, nearly a year earlier, and accessed records containing Private Information of Plaintiff and Class Members. Plaintiff and Class Members were required to provide this Private Information to TriZetto's Clients who, in turn, entrusted Plaintiff's and Class Members' Private Information to TriZetto.

41. According to disclosure documents filed by TriZetto, the following types of Private Information were compromised in the Data Breach: name, address,

Social Security number ("SSN"), date of birth, health insurance member number, and demographic, medical, and health insurance information.[11]

42. On or around December 9, 2025—***more than two months*** after discovering the Data Breach and ***more than thirteen months*** after the initial unauthorized access—TriZetto began notifying its customers about the Data Breach.[12]

43. TriZetto had obligations created by the FTC Act, HIPAA, contract, common law, and industry standards to keep Plaintiff's and Class Members' Private Information confidential and to protect it from unauthorized access and disclosure.

44. TriZetto failed to use reasonable security procedures and practices appropriate to the nature of the sensitive information it maintained on Plaintiff and Class Members, such as encrypting the information or deleting it when it is no longer needed, causing the exposure of Private Information.

45. The Data Breach resulted in an unauthorized third-party accessing and acquiring files containing Plaintiff's and Class Members' unencrypted Private Information.

---

[11] *Sample TPS Adult Notice Letter*, Office of the Maine Attorney General, https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/e2c4cc45-dc81-498d-89f0-28c887808b41.html?7194ef805fa2d04b0f7e8c9521f97343 (accessed Mar. 12, 2026).

[12] *Notice of Data Breach*, *supra* n. 4.

46. Upon information and belief, Plaintiff's and Class Members' Private Information was subsequently published on the dark web following the Data Breach, as that is the *modus operandi* of cybercriminals that commit cyber-attacks of this type.

47. Defendants failed to take precautions designed to keep individuals' Private Information secure.

48. TriZetto could and should have prevented the Data Breach by properly securing and encrypting the files and file servers containing the Private Information of Plaintiff and Class Members but failed to do so.

49. Cognizant could and should have prevented the Data Breach by adequately supervising TriZetto's cybersecurity practices to ensure they were sufficient to protect Plaintiff's and Class Members' Private Information against unauthorized disclosure but failed to do so.

50. Individuals affected by the Data Breach are, and remain, at risk of their data being sold or listed on the dark web and, ultimately, illegally used in the future.

**C. Defendants Acquire, Collect, and Store Plaintiff's and Class Members' Private Information**

51. During the ordinary course of their business, Defendants receive the Private Information of individuals, such as Plaintiff and Class Members, from Defendants' Clients. Plaintiff and Class Members have no say in what is provided

to Defendants and how that access occurs – they are required to provide this information to receive necessary health services.

52. Defendants retain and store this information and derive a substantial economic benefit from the Private Information they are provided and store. But for the receipt and storage of Plaintiff's and Class Members' Private Information, Defendants would be unable to perform their services.

53. At all relevant times, Defendants knew TriZetto was storing sensitive Private Information and that, as a result, its system would be an attractive target for cybercriminals.

54. Defendants also knew that a breach of their systems and exposure of the information stored therein would result in the increased risk of identity theft and fraud for the individuals whose Private Information was compromised, as well as intrusion into their highly private health information.

55. Defendants could have prevented the Data Breach by properly securing and encrypting the files and file servers containing the Private Information of Plaintiff and Class Members.

56. Defendants' Clients used Defendants' services and software, and in doing so entrusted Defendants with the most sensitive Private Information of their customers, like Plaintiff and Class Members.

57. Upon information and belief, Defendants made promises to their Clients to maintain and protect the Private Information of Plaintiff and Class Members, demonstrating an understanding of the importance of securing Private Information. Plaintiff and Class Members were third-party beneficiaries of such promises.

58. Defendants' negligence in safeguarding the Private Information of Plaintiff and Class Members is exacerbated by the repeated warnings and alerts from governments, industry groups, and civil society directed to ensuring entities like Defendants protect and secure sensitive data.

### D. Defendants Knew or Should Have Known of the Risk of a Cyberattack Because Healthcare Entities in Possession of Private Information Are Particularly Suspectable

59. Data thieves regularly target entities in the healthcare industry, like Defendants, due to the highly sensitive information they maintain. Defendants knew and understood that unprotected Private Information is valuable and highly sought after by criminals who seek to illegally monetize that Private Information through unauthorized access.

60. Defendants' data security obligations were particularly important given the substantial increase in cyberattacks and/or data breaches targeting healthcare entities like Defendants that collect and store Private Information and other sensitive information, preceding the date of the Data Breach.

61. In light of recent high profile data breaches at other industry-leading companies, including, e.g., Microsoft (250 million records, December 2019), Wattpad (268 million records, June 2020), Facebook (267 million users, April 2020), Progress Software (93.3 million records, May 2023), AT&T (51.2 million individuals, April 2024), Estee Lauder (440 million records, January 2020), Whisper (900 million records, March 2020), and Advanced Info Service (8.3 billion records, May 2020), Defendants knew or should have known that the Private Information they collected and maintained would be targeted by cybercriminals.

62. In 2024, 3,158 data breaches occurred, exposing approximately 1,350,835,988 sensitive records—a 211% increase year-over-year.[13]

63. The 330 breaches reported in 2021 exposed nearly 30 million sensitive records (28,045,658), compared to only 306 breaches that exposed nearly 10 million sensitive records (9,700,238) in 2020.[14]

64. Entities in custody of PHI and/or medical information reported the largest number of data breaches among all measured sectors in 2022, with the

---

[13] *See 2024 Data Breach Annual Report*, Identity Theft Res. Ctr. https://www.idtheftcenter.org/wp-content/uploads/2025/02/ITRC_2024DataBreachReport.pdf (last visited Aug. 25, 2025).

[14] *Id.*

highest rate of exposure per breach.[15] Indeed, when compromised, healthcare related data is among the most sensitive and personally consequential. A report focusing on healthcare breaches found that the "average total cost to resolve an identity theft-related incident . . . came to about $20,000," and that victims were often forced to pay out-of-pocket costs for healthcare they did not receive in order to restore coverage.[16] According to the report, almost 50 percent of the victims lost their healthcare coverage as a result of the incident, while nearly 30 percent said their insurance premiums went up after the event. Forty percent of the patients were never able to resolve their identity theft at all. Data breaches and identity theft have a crippling effect on individuals and detrimentally impact the economy as a whole.[17]

65. Indeed, cyberattacks on medical systems and healthcare and healthcare adjacent companies like Defendants have become so notorious that the FBI and U.S. Secret Service have issued a warning to potential targets, so they are aware of, and prepared for, a potential attack. As one report explained, "[e]ntities like smaller

---

[15] *See 2022 Annual Data Breach Report*, Identity Theft Res. Ctr. https://www.idtheftcenter.org/wp-content/uploads/2023/01/ITRC_2022-Data-Breach-Report_Final.pdf (last visited Aug. 25, 2025).
[16] *See* Elinor Mills, *Study: Medical identity theft is costly for victims*, CNET (March 3, 2010), https://www.cnet.com/news/study-medical-identity-theft-is-costly-for-victims/ (last visited Aug. 25, 2025).
[17] *See id.*

municipalities and hospitals are attractive. . . because they often have lesser IT defenses and a high incentive to regain access to their data quickly."[18]

66. Despite the prevalence of public announcements of data breach and data security compromises, Defendants failed to take appropriate steps to protect Plaintiff's and Class Members' Private Information from being compromised.

67. Defendants were, or should have been, fully aware of the unique type and the significant volume of data on their servers, and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

68. The injuries to Plaintiff and Class Members were directly and proximately caused by Defendants' failure to implement or maintain adequate data security measures for the Private Information of Plaintiff and Class Members.

69. The ramifications of Defendants' failure to keep secure the Private Information of Plaintiff and Class Members are long-lasting and severe. Once Private Information is stolen, fraudulent use of that information and damage to victims may continue for years.

70. As healthcare entities in possession of their patients' Private Information, Defendants knew, or should have known, the importance of

[18] *FBI, Secret Service Warn of Targeted Ransomware*, Law360, https://www.law360.com/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware (last visited Aug. 25, 2025).

safeguarding the Private Information entrusted to them by Plaintiff and Class Members and of the foreseeable consequences if their data security systems were breached. This includes the significant costs imposed on Plaintiff and Class Members because of a breach. Nevertheless, Defendants failed to take adequate cybersecurity measures to prevent the Data Breach.

**E. Defendants Failed to Comply with FTC Guidelines**

71. The FTC has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

72. In 2016, the FTC updated its publication, *Protecting Personal Information*: *A Guide for Business*, which established cyber-security guidelines for businesses. These guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.[19]

[19] *Protecting Personal Information: A Guide for Business*, Federal Trade Commission (2016), https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited Aug. 25, 2025).

73. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[20]

74. The FTC further recommends that companies not maintain Private Information longer than needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[21]

75. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

---

[20] *Id.*
[21] *Id.*

76. These FTC enforcement actions include actions against healthcare entities that fail to adequately protect patient's data, like Defendants here. *See, e.g., In re LabMD, Inc.*, 2016-2 Trade Cas. (CCH) ¶ 79708, 2016 WL 4128215, at *32 (F.T.C. July 28, 2016) ("[T]he Commission concludes that LabMD's data security practices were unreasonable and constitute an unfair act or practice in violation of Section 5 of the FTC Act.").

77. Section 5 of the FTC Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendants, of failing to use reasonable measures to protect Private Information. The FTC publications and orders described above also form part of the basis of Defendants' duty in this regard.

78. Defendants failed to properly implement basic data security practices.

79. Defendants' failure to employ reasonable and appropriate measures to protect against unauthorized access to patients' Private Information or to comply with applicable industry standards constitutes an unfair act or practice prohibited by Section 5 of the FTC Act.

80. Upon information and belief, Defendants were at all times fully aware of their obligation to protect the Private Information entrusted to them by their Clients; Defendants were also aware of the significant repercussions that would result from their failure to do so. Accordingly, Defendants' conduct was particularly

unreasonable given the nature and amount of Private Information they obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiff and the Class.

**F. Defendants Failed to Comply with HIPAA Guidelines**

81. As covered businesses under HIPAA (45 C.F.R. § 160.102), Defendants must comply with the HIPAA Privacy Rule and Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C.

82. Defendants are further subject to the rules and regulations for safeguarding electronic forms of medical information pursuant to the Health Information Technology Act ("HITECH").[22] *See* 42 U.S.C. § 17921, 45 C.F.R. § 160.103.

83. HIPAA's Privacy Rule establishes national standards for the protection of health information, including security standards for protecting health information that is kept or transferred in electronic form.

[22] HIPAA and HITECH work in tandem to provide guidelines and rules for maintaining protected health information. HITECH references and incorporates HIPAA.

84. HIPAA requires "compl[iance] with the applicable standards, implementation specifications, and requirements" of HIPAA "with respect to electronic protected health information." 45 C.F.R. § 164.302.

85. "Electronic protected health information" is "individually identifiable health information . . . that is (i) transmitted by electronic media; maintained in electronic media." *Id.* § 160.103.

86. HIPAA's Security Rule requires Defendants to do the following:

a. Ensure the confidentiality, integrity, and availability of all electronic protected health information the covered entity or business associate creates, receives, maintains, or transmits;

b. Protect against any reasonably anticipated threats or hazards to the security or integrity of such information;

c. Protect against any reasonably anticipated uses or disclosures of such information that are not permitted; and

d. Ensure compliance by its workforce.

87. HIPAA also requires Defendants to "review and modify the security measures implemented . . . as needed to continue provision of reasonable and appropriate protection of electronic protected health information." *Id.* § 164.306(e). Additionally, Defendants are required under HIPAA to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights." *Id.* § 164.312(a)(1).

88. HIPAA and HITECH also obligate Defendants to implement policies and procedures to prevent, detect, contain, and correct security violations, and to protect against uses or disclosures of electronic PHI that are reasonably anticipated but not permitted by the privacy rules. *See id.* §§ 164.306(a)(1) & (a)(3); *see also* 42 U.S.C. §17902.

89. HIPAA requires a covered entity to have and apply appropriate sanctions against members of its workforce who fail to comply with the privacy policies and procedures of the covered entity or the requirements of 45 C.F.R. Part 164, Subparts D or E. *See* 45 C.F.R. § 164.530(e).

90. HIPAA requires a covered entity to mitigate, to the extent practicable, any harmful effect that is known to the covered entity of a use or disclosure of PHI in violation of its policies and procedures or the requirements of 45 C.F.R. Part 164, Subpart E by the covered entity or its business associate. *See id.* § 164.530(f).

91. HIPAA also requires the Office of Civil Rights ("OCR") within the Department of Health and Human Services ("HHS") to issue annual guidance documents on the provisions in the HIPAA Security Rule. *See id.* §§ 164.302–18. For example, "HHS has developed guidance and tools to assist HIPAA covered entities in identifying and implementing the most cost effective and appropriate administrative, physical, and technical safeguards to protect the confidentiality, integrity, and availability of e-PHI and comply with the risk analysis requirements

of the Security Rule."[23] The list of resources includes a link to guidelines set by the National Institute of Standards and Technology (NIST), which OCR says "represent the industry standard for good business practices with respect to standards for securing e-PHI."[24]

**G. Defendants Failed to Comply with Industry Standards**

92. As noted above, experts studying cybersecurity routinely identify entities in possession of PII and PHI as being particularly vulnerable to cyberattacks because of the value of the Private Information they collect and maintain.

93. These experts have identified several best practices that entities in possession of PII and PHI, like Defendants, should employ at minimum, including but not limited to: educating all employees; strong passwords; multilayer security, including firewalls, anti-virus, and anti-malware software; encryption (making data unreadable without a key); multifactor authentication; backup data; and limiting which employees can access sensitive data. On information and belief, Plaintiff believes that Defendants were deficient in one or several of these best practices, which contributed to the occurrence of the Data Breach.

---

[23] US Department of Health & Human Services, Security Rule Guidance Material, https://www.hhs.gov/hipaa/for-professionals/security/guidance/index.html (last visited Aug. 25, 2025).

[24] *Guidance on Risk Analysis*, HHS, https://www.hhs.gov/hipaa/for-professionals/security/guidance/guidance-risk-analysis/index.html (last visited Aug. 25, 2025).

94. Other cybersecurity best practices that are standard for entities in possession of Private Information include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email-management systems; setting up network systems such as firewalls, switches and routers; monitoring and protecting physical security systems; monitoring and protecting access points in communication systems; and training staff regarding critical security points and potential vulnerabilities. Defendants failed to follow these cybersecurity best practices, including failing to train staff to adequately and timely monitor systems for malicious access.

95. Upon information and belief, Defendants failed to implement industry-standard cybersecurity measures, including failing to meet the minimum standards of the NIST Cybersecurity Framework Version 2.0 (including without limitation PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04).

96. These foregoing frameworks are existing and applicable industry standards for a business and healthcare provider's obligations to provide adequate data security for its patients' sensitive information. Upon information and belief, Defendants failed to comply with at least one—or potentially, any—of these

accepted standards, thereby opening the door to the threat actor and causing the Data Breach.

**H. Defendants Owed Plaintiff and Class Members a Duty to Safeguard their Private Information**

97. In addition to their obligations under federal and state laws, Defendants owed a duty to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the Private Information in their possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons. Defendants owed a duty to Plaintiff and Class Members to provide reasonable security, including consistency with industry standards and requirements, and to ensure that their computer systems, networks, and protocols adequately protected Plaintiff's and Class Members' Private Information.

98. Defendants owed a duty to Plaintiff and Class Members to create and implement reasonable data security practices and procedures to protect the Private Information in their possession, including adequately training their employees and others who accessed Private Information within their computer systems on how to adequately protect Private Information.

99. Defendants owed a duty to Plaintiff and Class Members to implement processes that would detect a compromise of Private Information in a timely manner.

100. Defendants owed a duty to Plaintiff and Class Members to act on data security warnings and alerts in a timely manner.

101. Defendants owed a duty to Plaintiff and Class Members to disclose in a timely and accurate manner when and how the Data Breach occurred.

102. Defendants owed a duty of care to Plaintiff and Class Members because they were foreseeable and probable victims of any inadequate data security practices.

## I. The Data Breach Increases Plaintiff's and Class Members' Risk of Identity Theft

103. Upon information and belief, Plaintiff's and Class Members' unencrypted Private Information has been publicly posted on a dark web leak page and will end up further disseminated and sold to criminals on the dark web because that is the *modus operandi* of cybercriminals.

104. Unencrypted Private Information may also fall into the hands of companies that will use the detailed data for targeted marketing without Plaintiff's and Class Members' approval.

105. Simply put, the Data Breach has left Plaintiff's and Class Members' Private Information easily accessible to unauthorized individuals.

106. Cyberattacks and data breaches at healthcare companies like Defendants are especially problematic because they can negatively impact on the physical health and overall daily lives of the affected individuals.

107. Researchers have found that, among healthcare service providers that experienced a data security incident, the death rate among patients increased in the months and years after the attack.[25]

108. Researchers have further found a correlation between healthcare service providers that experienced a data security incident and a deterioration in treatment timeliness and patient outcomes, generally.[26]

109. The link between a data breach and the risk of identity theft is simple and well-established. Criminals acquire and steal Private Information to monetize it. They do so by selling the stolen information on the black market to other criminals who then use the information to commit a variety of identity-theft-related crimes discussed below.

110. Plaintiff's and Class Members' Private Information is of great value to hackers and cybercriminals, and the data stolen in the Data Breach has been used and will continue to be used in a variety of ways for criminals to exploit Plaintiff and Class Members and profit from their misfortune.

---

[25] *See* Nsikan Akpan, *Ransomware and Data Breaches Linked to Uptick in Fatal Heart Attacks*, PBS (Oct. 24, 2019), https://www.pbs.org/newshour/science/ransomware-and-other-data-breaches-linked-to-uptick-in-fatal-heart-attacks.

[26] *See* Sung J. Choi et al., *Data Breach Remediation Efforts and Their Implications for Hospital Quality*, 54 Health Servs. Rsch. 971, 971–80 (2019), https://pmc.ncbi.nlm.nih.gov/articles/PMC6736905/pdf/HESR-54-971.

111. As a result of Defendants' failure to prevent the Data Breach, Plaintiff and Class Members have suffered and will continue to suffer damages, including monetary losses, lost time, anxiety, and emotional distress. They have suffered or are at an increased risk of suffering:

a. The loss of the opportunity to control how their Private Information is used;

b. The diminution in value of their Private Information;

c. The compromise and continuing publication of their Private Information;

d. Out-of-pocket costs associated with the prevention, detection, recovery, and remediation from identity theft or fraud;

e. Lost opportunity costs and lost wages associated with the time and effort expended addressing and attempting to mitigate the actual and future consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from identity theft and fraud;

f. Delay in receipt of tax refund monies;

g. Unauthorized use of stolen Private Information; and

h. The continued risk to their Private Information, which remains in Defendants' possession and is subject to further breaches so long as Defendants fail to undertake the appropriate measures to protect the Private Information in their possession.

112. Stolen Private Information is one of the most valuable commodities on the criminal information black market. According to Experian, a credit-monitoring service, stolen PII alone can be worth up to $1,000.00, depending on the type of information obtained.

113. The value of Plaintiff's and Class Members' Private Information on the black market is considerable. Stolen Private Information trades on the black market for years, and criminals frequently post stolen Private Information openly and directly on various "dark web" internet websites, making the information publicly available—for a substantial fee of course.

114. It can take victims years to spot identity theft, giving criminals plenty of time to use that information for cash.

115. One such example of criminals using Private Information for profit is the development of "Fullz" packages.

116. Cybercriminals can cross-reference stolen data with another source of Private Information, including unregulated data publicly available elsewhere, to assemble complete dossiers on individuals with an astonishingly comprehensive scope and degree of accuracy. These dossiers are known as "Fullz" packages.

117. The development of "Fullz" packages means that stolen Private Information from the Data Breach can be easily linked to and identified with Plaintiff's and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or payment card numbers may not have been included in the Private Information stolen by the cybercriminals in the Data Breach, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous

operators and criminals (such as illegal and scam telemarketers) over and over. That is exactly what is happening to Plaintiff and members of the proposed Class, and it is reasonable for any trier of fact—including this Court or a jury—to find that Plaintiff's and Class Members' stolen Private Information is being misused and that such misuse is fairly traceable to the Data Breach.

118. Identity thieves can also use stolen personal information such as SSNs for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud. According to Experian, one of the largest credit reporting companies in the world, "[t]he research shows that personal information is valuable to identity thieves, and if they can get access to it, they will use it" to, among other things: open a new credit card or loan, change a billing address so the victim no longer receives bills, open new utilities, obtain a mobile phone, open a bank account and write bad checks, use a debit card number to withdraw funds, obtain a new driver's license or ID, and/or use the victim's information in the event of arrest or court action.

119. Identity thieves can also use the victim's name and SSN to obtain government benefits or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's SSN and/or rent a house or receive medical services in the victim's name.

120. The Social Security Administration has similarly warned that identity thieves can use an individual's SSN to apply for additional credit lines.[27] Such fraud may go undetected until debt collection calls commence months, or even years, later. Stolen SSNs also make it possible for thieves to file fraudulent tax returns, file for unemployment benefits, or apply for a job using a false identity.[28] Each of these fraudulent activities is difficult to detect. An individual may not know that their SSN was used to file for unemployment benefits until law enforcement notifies their employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected because one was already filed on their behalf.

121. Further, an individual cannot obtain a new SSN without significant paperwork, administrative burden, and evidence of actual misuse. Even then, a new SSN may not be effective because "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[29]

---

[27] *Identity Theft and Your Social Security Number*, Social Security Administration (Oct. 2024) https://www.ssa.gov/pubs/EN-05-10064.pdf.

[28] Mark Majestic, *Protect Yourself from Identity Thieves*, Social Security Administration (Feb. 8, 2024), https://www.ssa.gov/blog/en/posts/2024-02-08.html.

[29] Brian Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft.

122. This was a financially motivated Data Breach; the only reason cybercriminals go through the trouble of running a targeted cyberattack against companies like Defendants is to get information that they can monetize by selling on the black market for use in the kinds of criminal activity described herein. This data demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "[c]ompared to credit card information, personally identifiable information and Social Security Numbers are worth more than 10x on the black market."[30]

123. Indeed, an SSN, date of birth, and full name can sell for $60 to $80 on the digital black market.[31] "[I]f there is reason to believe that your personal information has been stolen, you should assume that it can end up for sale on the dark web."[32]

---

[30] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT World, (Feb. 6, 2015), https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (last visited December 2, 2025).

[31] Michael Kan, *Here's How Much Your Identity Goes for on the Dark Web*, PC Mag (Nov. 15, 2017), https://www.pcmag.com/news/heres-how-much-your-identity-goes-for-on-the-dark-web.

[32] *Dark Web Monitoring: What You Should Know*, Consumer Fed'n of Am. (Mar. 19, 2019), https://consumerfed.org/consumer_info/dark-web-monitoring-what-you-should-know/.

124. These risks are both certainly impending and substantial. As the Consumer Federation of America has reported, if hackers get access to PHI/PII, *they will use it*.[33]

125. Without prompt notification, thieves have ample time to seek multiple treatments under the victim's name. Forty percent of consumers found out they were a victim of medical identity theft only when they received collection letters from creditors for expenses that were incurred in their names.[34]

126. Identity theft victims must spend significant time and money repairing the impact to their credit as well as protecting herself in the future.[35]

127. Defendants' failure to properly notify Plaintiff and Class Members of the Data Breach exacerbated their injuries by depriving them of the earliest opportunity to take appropriate measures to protect their Private Information and take other necessary steps to mitigate the harm caused by the Data Breach. These harms were further exacerbated by Defendants' failure to timely discover the Data Breach in the first instance.

---

[33] *Id.*

[34] *The Potential Damages and Consequences of Medical Identify Theft and Healthcare Data Breaches*, Experian, https://www.experian.com/assets/data-breach/white-papers/consequences-medical-id-theft-healthcare.pdf [hereinafter *Potential Damages*] (last visited Aug. 25, 2023).

[35] *Guide for Assisting Identity Theft Victims* at 4, F.T.C. (Sept. 2013), https://www.wyocourts.gov/app/uploads/2025/05/Guide-for-Assisting-Identity-Theft-Victims.pdf.

### J. Loss of Time to Mitigate the Risk of Identity Theft and Fraud

128. As a result of the recognized risk of identity theft, when a data breach occurs and an individual is notified by a company that their Private Information was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft of fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm.

129. Thus, due to the actual and imminent risk of identity theft, Plaintiff and Class Members must monitor their financial accounts for many years to mitigate the risk of identity theft.

130. Plaintiff and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions, such as changing passwords and securing their own computer systems.

131. Plaintiff's mitigation efforts are consistent with the conclusions of the U.S. Government Accountability Office' 2007 report regarding data breaches ("GAO Report"), which noted that victims of identity theft will face "substantial

costs and time to repair the damage to their good name and credit record."[36]

132. Plaintiff's mitigation efforts are also consistent with the steps the FTC recommends data breach victims take to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (and considering an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[37]

133. And for those Class Members who experience actual identity theft and fraud, the GAO Report found victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."

**K. Diminution of Value of Private Information**

134. Private Information is valuable property.[38] Its value is axiomatic, considering the value placed on "Big Data" in corporate America and the heavy consequences of cybercrime, include lengthy prison sentences. The significant risks

---

[36] *See* U.S. Gov't Accountability Off., GAO-07-737, Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown (2007), https://www.gao.gov/new.items/d07737.pdf [hereinafter 2007 GAO Report].

[37] *See* Identity Theft.gov, FTC, https://www.identitytheft.gov/Steps (last visited Aug. 25, 2025).

[38] *See* 2007 GAO Report, *supra* note 32.

and rewards associated with Private Information illustrate that it has considerable market value.

135. The Private Information stolen in the Data Breach is significantly more valuable than credit card information obtained in a retailer data breach, for example. Victims affected by those retailer breaches could avoid much of the potential future harm by cancelling credit or debit cards and obtaining replacements. The information stolen in the Data Breach is difficult, if not impossible, to change.

136. This kind of data, as one would expect, demands a much higher price on the Dark Web. As Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information . . . [is] worth more than 10x on the black market."[39]

137. Sensitive Private Information can sell for as much as $363 per record, according to the Infosec Institute.[40]

138. An active and robust legitimate marketplace for Private Information also exists. In 2024, the data brokering industry was worth roughly $280 billion and

---

[39] Greene, *supra* note 30.

[40] *See, e.g.*, Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, InfoSec (July 27, 2015), https://www.infosecinstitute.com/resources/healthcare-information-security/hackers-selling-healthcare-data-in-the-black-market/.

projected to grow to over $500 billion in the next decade.[41] In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who, in turn, aggregates the information and provides it to marketers or app developers.[42] For example, consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50 a year.[43]

139. As a result of the Data Breach, Plaintiff's and Class Members' Private Information, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished by its compromise and unauthorized release. This transfer of value occurred without any consideration paid to Plaintiff or Class Members for their property, resulting in an economic loss. Moreover, their Private Information is now readily available, and the rarity of the data has been lost, thereby causing additional loss of value.

---

[41] *See Data Broker Market (2025–2033)*, Grand View Research, https://www.grandviewresearch.com/industry-analysis/data-broker-market-report (last visited Nov. 14, 2025).

[42] David Lazarus, *Shadowy data brokers make the most of their invisibility cloak*, L.A. Times, (Nov. 5, 2019) https://www.latimes.com/business/story/2019-11-05/column-data-brokers (last visited Aug.25, 2025); *see, e.g.*, Data Coup, https://datacoup.com/ (last visited Aug. 25, 2025).

[43] Mike Brassfield, *This Company Will Pay You $50 This Year Just for Downloading Its Free App*, The Penny Hoarder (May 31, 2019) https://www.thepennyhoarder.com/make-money/nielsen-panel/ (last visited Dec. 2, 2025).

140. The fraudulent activity resulting from the Data Breach may not come to light for years.

141. Plaintiff and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. Plaintiff and Class Members are incurring and will continue to incur such damages in addition to any fraudulent use of their Private Information.

142. Defendants were, or should have been, fully aware of the unique type and the significant volume of data on TriZetto's network, amounting to millions of individuals' detailed Private Information and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

143. The injuries to Plaintiff and Class Members were directly and proximately caused by Defendants' failure to implement or maintain adequate data security measures for the Private Information of Plaintiff and Class Members.

### L. The Future Cost of Credit and Identity Theft Monitoring Is Reasonable and Necessary

144. Given the type of targeted attack here, the sophisticated criminal activity, the volume of data compromised in the Data Breach, and the sensitive type of Private Information involved in the Data Breach, there is a strong probability that entire batches of stolen information have been or will be placed on the black market/dark web for sale and purchase by criminals intending to use the Private Information for identity theft crimes—*e.g.*, opening bank accounts in the victims'

names to make purchases or to launder money; filing false tax returns; taking out loans or lines of credit; or filing false unemployment claims.

145. Such fraud may go undetected until debt collection calls commence months or years later. An individual may not know that their Private Information was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

146. Consequently, Plaintiff and Class Members are at an increased risk of fraud and identity theft for many years into the future.

147. The retail cost of credit monitoring and identity theft monitoring can cost around $200 a year per Class Member. This is a reasonable and necessary cost to monitor and protect Class Members from the risk of identity theft resulting from Defendants' Data Breach. This is a future cost for a minimum of five years, one that Plaintiff and Class Members would not need to bear had Defendants not failed to safeguard their Private Information.

**M. Loss of the Benefit of the Bargain**

148. Further, Defendants' poor data security deprived Plaintiff and Class Members of the benefit of their bargain. When agreeing to pay TriZetto's Clients for the provision of their services, Plaintiff and Class Members, like other reasonable patients, understood and expected that they were, in part, paying for

Defendants' service and necessary data security to protect the Private Information when, in fact, Defendants did not provide the expected data security. Accordingly, Plaintiff and Class Members received services that were of lesser value than what they reasonably expected to receive under the bargains they struck with Defendants.

**N. Plaintiff's Experiences**

149. On February 6, 2026, Plaintiff Thereasa Ilene Harris Vaughn received a letter from TriZetto informing her that her data was stolen during the Data Breach (the "Notice Letter"). The Notice Letter stated that the stolen data in the Data Breach may have involved the following Private Information relating to her: name, address, date of birth, SSN, health insurance member number, provider name, health insurer name, primary insured information, and other demographic, health, and health insurance information.

150. Upon information and belief, Plaintiff was required to provide her Private Information to a Client of Defendants as a condition of obtaining medical services, and her Private Information was in turn provided to Defendants.

151. Defendants were in possession of Plaintiff's Private Information before, during, and after the Data Breach.

152. Plaintiff greatly values her privacy and Private Information and takes reasonable steps to maintain the confidentiality of her Private Information. Plaintiff is very concerned about identity theft and fraud, as well as the consequences of such

identity theft and fraud resulting from the Data Breach. Plaintiff has not knowingly transmitted her unencrypted Private Information over the internet or any other unsecure source.

153. Plaintiff stores any and all documents containing Private Information in a secure location and destroys any documents she receives in the mail that contain any Private Information or that may contain any information that could otherwise be used to compromise her identity and financial accounts.

154. Moreover, she diligently chooses unique usernames and passwords for the various online accounts she maintains.

155. As a result of the Data Breach, Plaintiff has spent several hours researching the Data Breach, reviewing her bank accounts, monitoring her credit report, changing her passwords and other necessary mitigation efforts. This is valuable time that Plaintiff would have spent on other activities, including but not limited to work and recreation.

156. As a result of and following the Data Breach, Plaintiff has been the victim of attempted identity theft and financial fraud. In and around the fall of 2025, Plaintiff had one of her credit cards locked because the issuing company informed Plaintiff someone was trying to fraudulently open a new credit card using Plaintiff's name. Since that time, Plaintiff's credit card has remained locked, limiting her ability to make necessary purchases and payments.

157. Plaintiff has also experienced an increase in phishing phone calls and emails using her Private Information in the period following the Data Breach.

158. The Data Breach has caused Plaintiff to suffer fear, anxiety, and stress over the thought that her Private Information has been exposed.

159. Plaintiff anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. In addition, she will continue to be at present and continued increased risk of identity theft and fraud for years to come.

160. Plaintiff has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains in Defendants' possession, is protected and safeguarded from future breaches.

161. As a direct and traceable result of the Data Breach, Plaintiff suffered actual injury and damages after her Private Information was compromised and stolen in the Data Breach, including, but not limited to: (a) lost time and money related to monitoring her accounts and credit reports for fraudulent activity; (b) loss of privacy due to her Private Information being accessed and stolen by cybercriminals; (c) loss of the benefit of the bargain because Defendants did not adequately protect her Private Information; (d) emotional distress because identity thieves now possess her sensitive Private Information; (e) imminent and impending injury arising from the increased risk of fraud and identity theft now that her Private

Information has been stolen and likely published on the dark web; (f) diminution in the value of her Private Information, a form of intangible property that Defendants obtained from her; and (g) other economic and non-economic harm.

## CLASS ALLEGATIONS

162. Plaintiff brings this class action, individually and on behalf of the following Nationwide Class and State-based Subclasses:

> **Nationwide Class**: All individuals whose Private Information was accessed and/or acquired by an unauthorized party in the Data Breach (the "Class").
>
> **Mississippi Subclass**: All individuals residing in the State of Mississippi or who obtained health insurance or medical services from a Mississippi-based provider whose Private Information was accessed and/or acquired by an unauthorized party in the Data Breach.

163. Specifically excluded from the Class and Mississippi Subclass are Defendants, their officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, principals, servants, partners, joint venturers, or entities controlled by Defendants, and their heirs, successors, assigns, or other persons or entities related to or affiliated with Defendants and/or their officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

164. Plaintiff reserves the right to amend the Class and Mississippi Subclass definitions above if further investigation and/or discovery reveals that they should be expanded, narrowed, divided into subclasses, or otherwise modified in any way.

165. This action may be certified as a class action because it satisfies the numerosity, commonality, typicality, adequacy, and superiority requirements therein.

166. **Numerosity**: Both the Class and Mississippi Subclass are so numerous that joinder of all Class Members is impracticable. Upon information and belief, Plaintiff estimates that the Class is comprised of millions of members, if not more. The Class and Mississippi Subclass are sufficiently numerous to warrant certification.

167. **Typicality of Claims**: Plaintiff's claims are typical of those of other Class Members because Plaintiff, like the unnamed Class Members, had their Private Information compromised as a result of the Data Breach. Plaintiff is a member of both the Class and the Mississippi Subclass. Plaintiff's claims are typical of the claims of the members of the Class. The harm suffered by Plaintiff is similar to that suffered by all other Class Members, which was caused by the same misconduct by Defendants.

168. **Adequacy of Representation**: Plaintiff will fairly and adequately represent and protect the interests of the Class and Mississippi Subclass. Plaintiff has no interests antagonistic to, nor in conflict with, the Class. Plaintiff has retained competent counsel who are experienced in consumer and commercial class action litigation and who will prosecute this action vigorously.

169. **Superiority**: A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Because the monetary damages suffered by individual Class Members are relatively small, the expense and burden of individual litigation make it impossible for individual Class Members to seek redress for the wrongful conduct asserted herein. If Class treatment of these claims is not available, Defendants will likely continue their wrongful conduct and unjustly retain improperly obtained revenues or will otherwise escape liability for their wrongdoing as asserted herein.

170. **Predominant Common Questions**: The claims of all Class Members present common questions of law or fact, which predominate over any questions affecting only individual Class Members, including:

a. Whether Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

b. Whether Defendants' data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

c. Whether Defendants' storage of Plaintiff's and Class Member's Private Information was done in a negligent manner;

d. Whether Defendants had a duty to protect and safeguard Plaintiff's and Class Members' Private Information;

e. Whether Defendants' conduct was negligent;

f. Whether Defendants' conduct violated Plaintiff's and Class

Members' privacy;

g. Whether Defendants took sufficient steps to protect individuals' Private Information;

h. Whether Defendants were unjustly enriched; and

i. The nature of relief, including damages and equitable relief, to which Plaintiff and Class Members are entitled.

171. Information concerning Defendants' policies is available from Defendants' records.

172. Plaintiff knows of no difficulty which will be encountered in the management of this litigation which would preclude its maintenance as a class action.

173. The prosecution of separate actions by individual members of the Class and Mississippi Subclass would run the risk of inconsistent or varying adjudications and establishing incompatible standards of conduct for Defendants. Prosecution as a class action will eliminate the possibility of repetitious and inefficient litigation. Given that Defendants have not indicated any changes to their conduct or security measures, monetary damages are insufficient and there is no complete and adequate remedy at law.

## <u>COUNT I</u>
## NEGLIGENCE
## (ON BEHALF OF PLAINTIFF AND THE NATIONWIDE CLASS)

174. Plaintiff restates and realleges all the foregoing factual allegations, as if fully set forth herein.

175. Defendants knowingly obtained, possessed, and maintained Plaintiff's and Class Members' Private Information, and therefore had a duty to exercise reasonable care in safeguarding, securing, and protecting such Information from being disclosed, compromised, lost, stolen, and misused by unauthorized parties.

176. Defendants' duty also included a responsibility to implement processes by which they could detect and analyze a breach of their security systems quickly and to give prompt notice to those affected in the case of a cyberattack.

177. Defendants knew or should have known of the risks inherent in obtaining the Private Information of Plaintiff and Class Members and the importance of adequate security. Defendants were on notice because, on information and belief, they knew or should have known that they would be an attractive target for cyberattacks.

178. Defendants owed a duty of care to Plaintiff and Class Members whose Private Information was entrusted to them. Defendants' duties included, but were not limited to, the following:

a. To exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting Private Information in their possession;

b. To protect the Private Information in their possession by using reasonable and adequate security procedures and systems compliant with industry standards;

c. To have procedures in place to prevent the loss or unauthorized dissemination of Private Information in their possession;

d. To employ reasonable security measures and otherwise protect the Private Information of Plaintiff and Class Members pursuant to HIPAA and the FTCA;

e. To adequately and properly oversee third party vendors in which sensitive Private Information is entrusted;

f. To implement processes to quickly detect a data breach and to timely act on warnings about data breaches; and

g. To promptly notify Plaintiff and Class Members of the Data Breach, and to precisely disclose the type(s) of information compromised.

179. Defendants' duty to employ reasonable data security measures arose, in part, under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

180. Defendants' duty also arose because Defendants were bound by industry standards to protect the confidential Private Information entrusted to them.

181. Plaintiff and Class Members were foreseeable victims of any inadequate security practices on the part of Defendants, and Defendants owed them a duty of care to not subject them to an unreasonable risk of harm.

182. Defendants, through their actions and/or omissions, unlawfully breached their duty to Plaintiff and Class Members by failing to exercise reasonable care in protecting and safeguarding Plaintiff's and Class Members' Private Information within Defendants' possession.

183. Defendants, by their actions and/or omissions, breached their duty of care by failing to provide, or acting with reckless disregard for, fair, reasonable, or adequate computer systems and data security practices to safeguard the Private Information of Plaintiff and Class Members.

184. Defendants, by their actions and/or omissions, breached their duty of care by failing to promptly identify the Data Breach and then failing to provide prompt notice of the Data Breach to the persons whose Private Information was compromised.

185. Defendants breached their duties, and thus were negligent, by failing to use reasonable measures to protect Plaintiff's and Class Members' Private Information. The specific negligent acts and omissions committed by Defendants include, but are not limited to, the following:

a. Failing to adopt, implement, and maintain adequate security measures to safeguard Plaintiff's and Class Members' Private Information;

b. Failing to adequately monitor the security of their networks and systems;

c. Failing to periodically ensure that their email system maintained reasonable data security safeguards;

d. Allowing unauthorized access to Plaintiff's and Class Members' Private Information;

e. Failing to comply with the FTCA and HIPAA;

f. Failing to detect in a timely manner that Plaintiff's and Class Members' Private Information had been compromised; and

g. Failing to timely notify Plaintiff and Class Members about the Data Breach so they could take appropriate steps to mitigate the potential for identity theft and other damages.

186. Defendants acted with reckless disregard for the rights of Plaintiff and Class Members by failing to provide prompt and adequate individual notice of the Data Breach such that Plaintiff and Class Members could take measures to protect herself from damages caused by the fraudulent use of the Private Information compromised in the Data Breach.

187. Defendants were in a superior position to protect Plaintiff's and Class Members' Private Information because only Defendants had the ability to protect their systems (and the Private Information that they stored on them) from attack.

188. Defendants' breach of duties owed to Plaintiff and Class Members caused Plaintiff's and Class Members' Private Information to be compromised and exfiltrated, as alleged herein.

189. As a result of Defendants' ongoing failure to notify Plaintiff and Class Members regarding the Data Breach, Plaintiff and Class Members have been unable to take the necessary precautions to prevent future fraud and mitigate damages.

190. Defendants' breaches of duty also caused a substantial, imminent risk to Plaintiff and Class Members of identity theft, loss of control over their Private Information, and loss of time and money to monitor their accounts for fraud.

191. As a result of Defendants' negligence in breach of their duties owed to Plaintiff and Class Members, Plaintiff and Class Members are in danger of imminent harm in that their Private Information, which is still in the possession of third parties, will be used for fraudulent purposes.

192. Defendants also had independent duties under state laws that required them to reasonably safeguard Plaintiff's and Class Members' Private Information and promptly notify them about the Data Breach.

193. As a direct and proximate result of Defendants' negligent conduct, Plaintiff and Class Members have suffered damages as alleged herein and are at imminent risk of further harm.

194. The injury and harm that Plaintiff and Class Members suffered was reasonably foreseeable.

195. Plaintiff and Class Members have suffered injury and are entitled to damages in an amount to be proven at trial.

196. In addition to monetary relief, Plaintiff and Class Members are also entitled to injunctive relief requiring Defendants to, *inter alia*, strengthen their data security systems and monitoring procedures, conduct periodic audits of those systems, and provide lifetime credit monitoring and identity theft insurance to Plaintiff and Class Members.

## COUNT II
## NEGLIGENCE *PER SE*
## (ON BEHALF OF PLAINTIFF AND THE NATIONWIDE CLASS)

197. Plaintiff restates and realleges all the foregoing factual allegations as if fully set forth herein.

198. Pursuant to Section 5 of the FTCA, Defendants had a duty to provide fair and adequate computer systems and data security to safeguard the Private Information of Plaintiff and Class Members.

199. Pursuant to HIPAA, 42 U.S.C. § 1302(d), *et seq*., Defendants had a duty to implement reasonable safeguards to protect Plaintiff's and Class Members' Private Information.

200. Specifically, pursuant to HIPAA, Defendants had a duty to render the electronic PHI they maintained unusable, unreadable, or indecipherable to unauthorized individuals by "the use of an algorithmic process to transform data into a form in which there is a low probability of assigning meaning without the use of a confidential process or key." *See* definition of "encryption" at 45 C.F.R. § 164.304.

201. Defendants breached their duties to Plaintiff and Class Members under the FTCA and HIPAA by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' Private Information.

202. Specifically, Defendants breached their duties by failing to employ industry-standard cybersecurity measures to comply with the FTCA, including but not limited to proper segregation, access controls, password protection, encryption, intrusion detection, secure destruction of unnecessary data, and penetration testing.

203. The FTCA prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice of failing to use reasonable measures to protect PII and PHI (such as the Private Information compromised in the Data Breach). The FTC rulings and publications described above, together with the industry-standard cybersecurity measures set forth herein, form part of the basis of Defendant's duty in this regard.

204. Defendants also violated the FTCA and HIPAA by failing to use reasonable measures to protect the Private Information of Plaintiff and Class Members and by not complying with applicable industry standards, as described herein.

205. It was reasonably foreseeable, particularly given the growing number of data breaches of Private Information, that the failure to reasonably protect and secure Plaintiff's and Class Members' Private Information in compliance with applicable laws would result in an unauthorized third-party gaining access to Defendants' networks, databases, and computers that stored Plaintiff's and Class Members' unencrypted Private Information.

206. Plaintiff and Class Members are within the class of persons the FTCA and HIPAA are intended to protect, and Defendants' failure to comply with both constitutes negligence *per se*.

207. Plaintiff's and Class Members' Private Information constitutes personal property that was stolen due to Defendants' negligence, resulting in harm, injury, and damages to Plaintiff and Class Members.

208. As a direct and proximate result of Defendants' negligence *per se*, Plaintiff and the Class have suffered, and continue to suffer, injuries and damages arising from the unauthorized access of their Private Information, including but not limited to damages from the lost time and effort to mitigate the actual and potential impact of the Data Breach on their lives.

209. As a direct and proximate result of Defendants' negligent conduct, Plaintiff and Class Members have suffered injury and are entitled to compensatory and consequential damages in an amount to be proven at trial.

210. In addition to monetary relief, Plaintiff and Class Members are also entitled to injunctive relief requiring Defendants to, *inter alia*, strengthen their data security systems and monitoring procedures, conduct periodic audits of those systems, and provide lifetime credit monitoring and identity theft insurance to Plaintiff and Class Members.

**COUNT III**
**BREACH OF THIRD-PARTY BENEFICIARY CONTRACT**
**(ON BEHALF OF PLAINTIFF AND THE NATIONWIDE CLASS)**

211. Plaintiff re-alleges and incorporates by reference the foregoing factual allegations as if fully set forth herein.

212. Defendants and their Clients entered into written contracts to provide healthcare administration services for the benefit of Plaintiff and Class Members.

213. In exchange, Defendants agreed to implement adequate security measures to safeguard the Private Information of Plaintiff and Class Members and to timely and adequately notify them of any unauthorized access to their Private Information.

214. These contracts were made expressly for the benefit of Plaintiff and Class Members, as Plaintiff and Class Members were the intended third-party beneficiaries of the contracts entered into between Defendants and their Clients. Defendants knew that, if they were to breach those contracts with their Clients, their Clients' customers—Plaintiff and Class Members—would be harmed.

215. Defendants breached the contracts they entered into with their Clients by, among other things, failing to (i) use reasonable data security measures, (ii) implement adequate protocols and employee training sufficient to protect Plaintiff's and Class Members' Private Information from unauthorized disclosure to third parties, and (iii) promptly and adequately notify Plaintiff and Class Members of the

Data Breach.

216. Plaintiff and Class Members were harmed by Defendants' breach of their contracts with their Clients, as such breach is alleged herein, and are entitled to losses and damages they have sustained as a proximate result thereof.

217. Plaintiff and Class Members are also entitled to their costs and attorneys' fees incurred in this action.

**COUNT IV**
**UNJUST ENRICHMENT**
**(ON BEHALF OF PLAINTIFF AND THE NATIONWIDE CLASS)**

218. Plaintiff restates and realleges all the foregoing factual allegations, as if fully set forth herein.

219. Plaintiff and Class Members conferred a benefit on Defendants when TriZetto and Cognizant's Clients turned over their Private Information to TriZetto. Moreover, upon information and belief, Plaintiff and Class Members allege that payments made by Defendants' Clients to TriZetto and/or Cognizant included payment for cybersecurity protection to protect Plaintiff's and Class Members' Private Information, and that those cybersecurity costs were passed on to Plaintiff and Class Members in the form of elevated prices charged by the Clients for their services. But Plaintiff and Class Members did not receive such protection.

220. Upon information and belief, Defendants fund their data security measures entirely from its general revenue, including from payments made by their Clients on behalf of Plaintiff and Class Members.

221. As such, a portion of the payments made by Plaintiff and Class Members is to be used to provide a reasonable and adequate level of data security that is in compliance with applicable state and federal regulations and industry standards, and the amount of the portion of each payment made that is allocated to data security is known to Defendants.

222. Defendants have retained the benefits of their unlawful conduct, including the amounts of payment received indirectly from Plaintiff and Class Members that should have been used for adequate cybersecurity practices that it failed to provide.

223. Defendants knew that Plaintiff and Class Members conferred a benefit upon them, which Defendants accepted. Defendants profited from these transactions and used the Private Information of Plaintiff and Class Members for business purposes, while failing to use the payments they received for adequate data security measures that would have secured Plaintiff's and Class Members' Private Information and prevented the Data Breach.

224. Defendants failed to secure Plaintiff's and Class Members' Members' Private Information and, therefore, did not fully compensate Plaintiff or Class Members for the value that their Private Information provided.

225. Defendants acquired the Private Information through inequitable record retention as they failed to investigate and/or disclose the inadequate data security practices previously alleged.

226. If Plaintiff and Class Members had known that Defendants had not adequately secured their Private Information, they would not have entrusted such Private Information to Defendants.

227. Due to Defendants' conduct alleged herein, it would be unjust and inequitable under the circumstances for Defendants to be permitted to retain the benefit of their wrongful conduct.

228. As a direct and proximate result of Defendants' conduct, Plaintiff and Class Members have suffered, and/or are at a continued, imminent risk of suffering, injury that includes but is not limited to the following: (i) actual identity theft; (ii) the loss of the opportunity to control how their Private Information is used; (iii) the compromise, publication, and/or theft of their Private Information; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their Private Information; (v) lost opportunity costs associated with effort expended and the loss of productivity

addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (vi) the continued risk to their Private Information, which remains in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fails to undertake appropriate and adequate measures to protect Private Information in its continued possession; and (vii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the Private Information compromised as a result of the Data Breach for the remainder of the lives of Plaintiff and Class Members.

229. Plaintiff and Class Members are entitled to full refunds, restitution, and/or damages from Defendants and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by Defendants from their wrongful conduct. This can be accomplished by establishing a constructive trust from which the Plaintiff and Class Members may seek restitution or compensation.

230. Plaintiff and Class Members may not have an adequate remedy at law against Defendants, and accordingly, they plead this claim for unjust enrichment in addition to, or in the alternative to, other claims pleaded herein.

## COUNT VII – MISSISSIPPI CONSUMER PROTECTION ACT MISS. CODE §§ 75-24-1, *ET SEQ.* (ON BEHALF OF PLAINTIFF AND THE MISSISSIPPI SUBCLASS)

231. Plaintiff repeats and re-alleges the foregoing factual allegations as if fully set forth herein.

232. Defendants are "persons" as defined by Miss. Code § 75-24-3.

233. Defendants advertised, offered, or sold goods or services in Mississippi and engaged in trade or commerce directly or indirectly affecting the people of Mississippi, as defined by Miss. Code § 75-24-3.

234. Defendants engaged in unfair and deceptive trade acts or practices, including:

a. Failing to implement and maintain reasonable security and privacy measures to protect Plaintiff's and Mississippi Subclass Members' Private Information, which was a direct and proximate cause of the Data Breach;

b. Failing to identify foreseeable security and privacy risks, remediate identified security and privacy risks, and adequately improve security and privacy measures after previous cybersecurity incidents, which was a direct and proximate cause of the Data Breach;

c. Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Mississippi Subclass Members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. § 45, which was a direct and proximate cause of the Data Breach;

d. Misrepresenting that they would protect the privacy and confidentiality of Plaintiff's and Mississippi Subclass Members' Private Information, including by implementing and maintaining reasonable security measures;

e. Misrepresenting that they would comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Mississippi Subclass Members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. § 45;

f. Omitting, suppressing, and concealing the material fact that they did not reasonably or adequately secure Plaintiff's and Mississippi Subclass Members' Private Information; and

g. Omitting, suppressing, and concealing the material fact that they did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Mississippi Subclass Members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. § 45.

235. The above-described conduct violated Miss. Code Ann. § 75-24-5(2), including:

a. Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have;

b. Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another; and

c. Advertising goods or services with intent not to sell them as advertised.

236. Defendants intended to mislead Plaintiff and Mississippi Subclass Members and induce them to rely on their misrepresentations and omissions.

237. Defendants' representations and omissions were material because they were likely to deceive Plaintiff and Class Members, including Mississippi Subclass

Members, about the adequacy of Defendants' data security and ability to protect the confidentiality of consumers' Private Information.

238. Had Defendants disclosed to Plaintiff and Mississippi Subclass Members that their data systems were not secure and thus were vulnerable to attack, Defendants could not have continued in business and would have been forced to adopt Case reasonable data security measures and comply with the law. Instead, Defendants received, maintained, and compiled Plaintiff's and Mississippi Subclass Members' Private Information as part of the services Defendants provided and for which Plaintiff and Mississippi Subclass Members paid without advising Plaintiff and Mississippi Subclass Members that Defendants' data security practices were insufficient to maintain the safety and confidentiality of Plaintiff's and Mississippi Subclass Members' Private Information. Accordingly, Plaintiff and the Mississippi Subclass Members acted reasonably in relying on Defendants' misrepresentations and omissions, the truth of which they could not have discovered.

239. Defendants had a duty to disclose the above-described facts due to the circumstances of this case and the sensitivity and extensiveness of the Private Information in their possession. In addition, such a duty is implied by law due to the nature of the relationship between consumers—including Plaintiff and the Mississippi Subclass—and Defendants because consumers cannot fully protect

their interests regarding their data and placed trust and confidence in Defendants. Defendants' duty to disclose also arose from their:

a. Possession of exclusive knowledge regarding the security of the data in their systems;

b. Active concealment of the state of their security; and/or

c. Incomplete representations about the security and integrity of their computer and data systems and their prior data breaches while purposefully withholding material facts from Plaintiff and the Mississippi Subclass that contradicted these representations.

240. Defendants acted intentionally, knowingly, and maliciously to violate Mississippi's Consumer Protection Act and recklessly disregarded Plaintiff and Mississippi Subclass members' rights. Defendants (1) represented in their information privacy and confidentiality policies that they were implementing reasonable security measures to protect Plaintiff's and Class Members' sensitive personal information and (2) failed to implement reasonable data security measures, including reducing and outsourcing cybersecurity personnel, despite being on notice that their data security and privacy protections were inadequate.

241. As a direct and proximate result of Defendants' unfair and deceptive acts or practices and Plaintiff's and Mississippi Subclass Members' purchase of goods or services primarily for personal, family, or household purposes, Plaintiff and Mississippi Subclass Members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including loss of the benefit of their bargain with Defendants' Clients,

since they would not have paid Clients' for goods and services or would have paid less for such goods and services had they known of Defendants' violations alleged herein; losses from fraud and identity theft; costs for credit monitoring and identity protection services; time and expenses related to monitoring their financial accounts for fraudulent activity; time and money spent cancelling and replacing passports; loss of value of their PII; and an increased, imminent risk of fraud and identity theft.

242. Defendants' violations present a continuing risk to Plaintiff and Mississippi Subclass Members as well as to the general public.

243. Plaintiff and Mississippi Subclass Members seek all monetary and non-monetary relief allowed by law, including actual damages, restitution and other relief under Miss. Code § 75-24-11, injunctive relief, punitive damages, and reasonable attorneys' fees and costs.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of herself, the Class, and the Mississippi Subclass described above, seek the following relief:

a. An order certifying this action as a Class action under Fed. R. Civ. P. 23, defining the Class as requested herein, appointing the undersigned as Class counsel, and finding that Plaintiff is a proper representative of the Nationwide Class and of the Mississippi Subclass requested herein;

b. Judgment in favor of Plaintiff and Class Members awarding them appropriate monetary relief, including actual damages, statutory damages, equitable relief, restitution, disgorgement, and statutory costs;

c. An order providing injunctive and other equitable relief as necessary to protect the interests of the Class as requested herein;

d. An order instructing Defendants to purchase or provide funds for lifetime credit monitoring and identity theft insurance to Plaintiff and Class Members;

e. An order requiring Defendants to pay the costs involved in notifying Class Members about the judgment and administering the claims process;

f. A judgment in favor of Plaintiff and Class Members awarding them prejudgment and post-judgment interest, reasonable attorneys' fees, costs, and expenses as allowable by law; and

g. An award of such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury of all claims in this Class Action Complaint so triable.

Dated: March 19, 2026 Respectfully submitted,

*\/s/ James E. Cecchi*
James E. Cecchi
Jason H. Alperstein
**CARELLA BYRNE CECCHI BRODY & AGNELLO, P.C.**
5 Becker Farm Road
Roseland, NJ 07068
Telephone: (973) 994-1700
Fax: (973) 994-1744
jcecchi@carellabyrne.com
jalperstein@carellabyrne.com

James J. Pizzirusso*

Kira Hessekiel*
Nicholas Murphy*
Amanda Boltax*
**HAUSFELD LLP**
1200 17th Street, N.W., Suite 600
Washington, DC 20036
Tel.: (202) 540-7200
Email: jpizzirusso@hausfeld.com
Email: khessekiel@hausfeld.com
Email: nmurphy@hausfeld.com
Email: mboltax@hausfeld.com

Steven M. Nathan*
Ashley M. Crooks
**HAUSFELD LLP**
33 Whitehall Street, 14th Floor
New York, New York 10004
Tel.: (646) 357-1100
Email: snathan@hausfeld.com
Email: acrooks@hausfeld.com

*Counsel for Plaintiff and the proposed Class*

*pro hac vice forthcoming*